UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

U.S. COMMODITY FUTURES
TRADING COMMISSION,

Plaintiff,

v.					6:10-cv-84

JOSEPH L. AUTRY, JR. and
AUTRY CAPITAL MANAGEMENT
LLC f/k/a JOEY AUTRY LLC,

ORDER

I. INTRODUCTION

Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff") filed the underlying complaint alleging that Defendants Joseph L. Autry, Jr. ("Autry") and Autry Capital Management LLC f/k/a Joey Autry LLC ("ACM") (collectively, "Defendants") defrauded customers by issuing false statements and misappropriating customer funds in violation of Sections 4b(a)(1)(A), (B), and (C) of the Commodity Exchange Act, as amended by the CFTC Reauthorization Act of 2008 ("CRA"), to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006). *See* Doc. 1. Now before the Court is Plaintiff's "Motion for Summary Judgment." *See* Doc. 11.

II. BACKGROUND

In 2008, Autry began soliciting customers to trade commodity futures contracts through ACM, a limited liability company he had formed. *See* Doc. 11-2 at 2. Autry told prospective customers that he had developed a trading system called "Fuel Matrix," which would trade energy futures contracts via Globex, an electronic trading platform. *See id.*

In May 2008, Autry opened a commodity futures trading account in ACM's name with MF Global, Inc. ("MF Global"), a registered clearing futures commission merchant ("FCM"). *See id.* Autry had sole trading authority over the ACM trading account. *See id.* Autry garnered several customers who invested funds with ACM to trade commodity futures contracts on their behalf. *See id.*

Autry deposited the ACM customer funds into a bank account that he maintained, under the name of "Joseph L. Autry, Jr. d/b/a Joey Autry LCC" (the former name of ACM) with Farmers and Merchants Bank ("F&M Bank") in Statesboro, Georgia. *See id.* Autry was the sole signatory on the F&M Bank account and had exclusive control over the ACM customers' funds. *See id.*

ACM customer funds were transferred from the F&M Bank account to ACM's trading account at MF Global for trading. *See id.* at 3. Periodically, Autry transferred customer funds from the ACM trading account to the F&M Bank account, from which he issued checks to pay himself performance fees and to pay his personal debts and expenses. *See id.*

Throughout the period of May 2008 through January 2010, the ACM trading account suffered consistent trading losses. *See id.* at 4.

To conceal his misappropriation, Autry prepared and sent false statements to ACM's customers via email misrepresenting that they were earning profits each month, when in fact Autry's actual trading resulted in net losses every month. *See id.* The statements showed the customer's month-end balance

and profit supposedly earned, but did not show any buy or sell transactions. *See id.* at 4.

For example, at the end of July 2009, Autry issued false statements to two ACM customers, one who had invested $30,000 in June 2009 and the other had invested $25,000 in July 2009. *See id.* at 4-5. The statements stated they had made profits with month-end balances of $31,880 and $25,825, for a total of $57,705. *See id.* at 5. In reality, at the end of July the ACM trading account contained only $16,670. *See id.*

Then, at the end of August 2009, Autry issued additional false statements to the same two customers stating that they had made profits with month-end balances of $32,820 and $26,720, for a total of $58,540. *See id.* In reality, the ACM trading account had a month-end balance of only $21.93. *See id.*

At the end of September 2009, Autry sent false statements to another ACM customer who had invested $60,000 in that month and to two other customers stating that they had made profits with month-end balances of $33,800, $27,700, and $61,700, for a total of $123,200. *See id.* In reality, in September 2009, the ACM trading account had a month-end balance of only $21,605. *See id.*

At the end of October 2009, Autry issued false statements to four ACM customers stating that they had made profits with month-end balances of $34,440, $28,400, $62,780 and $30,200, for a total of $155,820. *See id.*

Autry stopped providing account statements to customers around January 2010. *See id.* ACM's customers demanded the return of their money, and Autry did not respond. *See id.* By the end of January 2010, the balance in ACM's trading account was approximately $4,220. *See id.* at 6.

Autry admitted the following at his sentencing hearing:

> Customers would place money with Mr. Autry for energy futures trading. Seven customers placed $265,200. They were told by contract that they would receive any profits less the management fee, and performance bonus that would go to Mr. Autry from any profits.
>
> Mr. Autry generated account statements for the investors which indicated trading profits when in fact there were losses. The false account statements showed profits sufficient for Mr. Autry to collect management fees and performance fees even though there were no profits, but instead losses.
>
> Investors were paid purported profits out of other investors' funds. Because there were no actual profits, Mr. Autry's draws were from investors' principal funds. Mr. Autry's continuation of the provisional false accounts [sic] statements lulled investors, and allowed the recruiting of additional investors whose funds were similarly misused.
>
> Late coming investors' funds were used to pay fraudulent returns to early investors in what is popularly, though somewhat inaccurately, described as a Ponzi scheme.

Doc. 11-10 at 10-11.

Autry operated ACM from May 2008 until January 2010. *See* Doc. 11-5 at 3. As the president and sole manager and employee of ACM, he acted as a commodity

2

pool operator by soliciting, accepting and receiving ACM customer funds that were pooled for the purpose of trading on-exchange commodity futures contracts. *See* Doc. 11-2 at 7. Autry's actions and inactions fell within the scope of his employment with ACM. *See id.*

On September 15, 2010, the Government indicted Autry, charging him with fourteen counts of wire fraud and one count of commodities fraud. *United States v. Autry*, 6:10-cr-22, Doc. 1. On February 1, 2011, Autry, in a sentencing hearing before the Court, pled guilty to count six, wire fraud, in violation of 18 U.S.C. § 1343, of his indictment. *See id.*, Doc. 26. On July 21, 2011, the Court sentenced Autry to twenty-seven months in prison and ordered him to pay $155,200 in restitution. *See id.*, Doc. 32.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on summary judgment, the Court views the facts and inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir. 1991).

"The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The nonmoving party then "may not rest upon the mere allegations or denials of [his] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

#### B. Analysis

Plaintiff first argues that Defendants violated "Sections 4b(a)(1)(A), (B), and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B),(C)." *See* Doc. 11-1 at 15. Plaintiff argues that based on Defendants' admissions in their answer and Autry's admissions at his sentencing hearing, it is undisputed that Defendants knowingly and intentionally misappropriated ACM customer funds and issued false account statements to ACM customers, in violation of the referenced anti-fraud statutory provisions. *See* Doc. 11-1 at 15.

7 U.S.C. § 6b(a)(1)(A)-(C) provides:

It shall be unlawful for any person, in or in connection with any order to

make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . to cheat or defraud or attempt to cheat or defraud the other person; willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [and] willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . . the other person . . . .

Plaintiff also argues that Defendants violated "Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006)." *See* Doc. 11-1 at 16. Plaintiff avers that it is undisputed that Autry admitted that while acting as a commodity pool operator ("CPO") he knowingly and intentionally misappropriated customer funds and issued false account statements to ACM customers. *See id.* at 17.

7 U.S.C. § 6o(1)(A)-(B) provides:

It shall be unlawful for a . . . commodity pool operator . . . to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Plaintiff also avers that, pursuant to "Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006)," ACM is liable for the fraudulent acts, omissions and failures of Autry because Defendants have admitted that Autry's actions occurred within the scope of his employment with ACM. *See* Doc. 11-1 at 17.

7 U.S.C. § 2(a)(1)(B) provides that:

The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

In their response, Defendants do not contest the allegations that they violated 7 U.S.C. § 6b(a)(1)(A)-(C) and 7 U.S.C. § 6o(1)(A)-(B). *See* Doc. 13 at 1-5. ("The Defendant has never denied the facts that have been set out in the Motion for Summary Judgment by the Commodities Futures Trading Commission."). Therefore, based on the undisputed facts, the Court concludes, as a matter of law, that Autry violated 7 U.S.C. § 6b(a)(1)(A)-(C) and 7 U.S.C. § 6o(1)(A)-(B), alleged in Counts One and Two of Plaintiff's complaint, and because Autry was acting within the scope

4

of his employment, ACM is likewise liable for such violations. The only contested issue is the nature of relief to be granted or imposed.

First, Plaintiff seeks permanent injunctive relief pursuant to 7 U.S.C. § 13a-1, which provides that "*[u]pon a proper showing*, a permanent . . . injunction . . . shall be granted without bond." *See id.* § 13a-1(b) (emphasis added).

"Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations." *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *see also SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).

"The factors to be considered are 'the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.'" *Commodity Futures Trading Comm'n v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d. 1229, 1247 (N.D. Ga. 2006) (quoting *Ginsburg*, 362 F.3d at 1304).

"While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly suggestive of the likelihood of future violations.'" *Hunt*, 591 F.2d at 1220. "When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct." *Id.*

Plaintiff seeks a permanent injunction prohibiting Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly:

a) in conduct in violation of Sections 4b(a)(1)(A), (B) and (C) of the Act to be codified at 7 U.S.C. §§ 6b(a)(1)(A), (B) and (C) (2006), and 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006);
b) trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006);
c) entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for any personal or proprietary account or for any account in which they have a direct or indirect interest;

5

d) having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

e) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

f) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

g) applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14 (a)(9) (2010); and

h) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)(2010)), agent or any other officer or employee of any person (as that term is defined in Section 1a(28) of the Act, 7 U.S.C. § 1a(28) (2006)) registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

Doc. 11-1 at 21-22. It is undisputed that Defendants knowingly committed fraud for more than one year. Because of the knowing and willful violations and their recurrent nature, the Court concludes that Plaintiff has made a sufficient showing to justify a "reasonable likelihood of future violations." *Hunt*, 591 F.2d at 1220. Moreover, although Defendants aver that they have no intent of returning to commodities trading, Defendants have "no objection to the entry of a permanent injunction" and ask that the Court "enter the permanent injunction as requested by the Plaintiffs." *See* Doc. 13 at 2, 4.

Accordingly, the Court **GRANTS** the permanent injunction as outlined supra in sections (a) through (h). *See Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1347 n.5 (11th Cir. 2008) ("[I]njunctions broadly prohibiting 'commodity-related activity' have been found to be within a district court's authority.").

In addition, Plaintiff seeks the imposition of a civil monetary penalty. *See* Doc. 11-1 at 22. Plaintiff argues that the imposition of a penalty as "to each ACM customer they have admitted to have defrauded" is warranted because Defendants' "conduct was intentional and they personally benefited from their fraudulent conduct." *See id.* In response, Defendants ask that the Court not impose a penalty or only impose a nominal penalty. *See* Doc. 13 at 4. Defendants aver that

6

Autry has been punished sufficiently as he has been sentenced to twenty-seven months in prison and ordered to pay $155,200 in restitution. *See id.* at 3. In addition, Defendants aver that the burden of a penalty upon Autry would be financially onerous and potentially ruinous, and he has been punished sufficiently without the imposition of a penalty. *See id.*

7 U.S.C. § 13a-1(d)(1) provides:

In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation . . . a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation . . . .

Specifically, 17 C.F.R. § 143.8(a)(1)(iii)-(iv) permits the Court to impose civil monetary penalties for violations committed by Defendants before October 22, 2008 of not more than the greater of $130,000 or triple the monetary gain to Defendants for each violation and for violations after such date, not more than the greater of $140,000 or triple the monetary gain to Defendants for each violation.

"A district court is not obligated to impose the maximum monetary penalty available under the Act." *Commodity Futures Trading Comm'n v. Capital Blu Mgmt., LLC*, 2011 WL 2357629, at *7 (M.D. Fla. June 9, 2011).

The penalty must be "rationally related to the offense charged or the need for deterrence." *See Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008). In applying this standard, it is appropriate to take into account "the general seriousness of the violation[s] as well as any particular mitigating or aggravating circumstances that exist." *Wilshire*, 531 F.3d at 1346. Factors that may be considered include: "(1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) [the defendant]'s state of mind; (3) the consequences flowing from the violative conduct; and (4) [the defendant]'s post-violation conduct." *R & W Technical Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 177 (5th Cir. 2000).

"[D]efrauding customers should be considered very serious." *JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557, 1571 (11th Cir. 1995) (internal quotation omitted). It is undisputed that Autry knowingly and repeatedly deceived his customers. Therefore, the imposition of a monetary penalty is warranted.

"[B]ecause the remedy is punitive, it also should be carefully measured. The penalty should be sufficient but not harsher than necessary to meet the goals of relatedness, proportionality, and deterrence." *Capital Blu Mgmt.*, 2011 WL 2357629, at *11. The Court is "cognizant of its duty to be realistic and not set a figure which is impossible for [Autry] to comply with due to lack of monetary resources." *Commodity Futures Trading Comm'n v. Heffernan*, 274 F. Supp. 2d 1375, 1378 (S.D. Ga. 2003).

After a consideration of the record, the Court **ORDERS** Defendants to pay a one thousand ($1,000) dollar penalty. In

7

calculating this amount, this Court is mindful that it has previously ordered Defendants to pay restitution to the victims of their fraud, that Autry has been sentenced to twenty-seven months in prison, and that Autry averred that he currently has limited financial resources.

## IV. CONCLUSION

Plaintiff's "Motion for Summary Judgment," see Doc. 11, is **GRANTED**.

Plaintiff's request for a permanent injunction is **GRANTED**.

Defendants are **ORDERED** to pay a civil penalty of one thousand ($1,000) dollars.

This 19th day of December 2011.

*[signature]*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

8